*KUNIAN V. SMOLLON*

NOTICE OF REMOVAL TO USDC

EXHIBIT A

# COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, SS**                                   CIVIL ACTION NO

18-3098

---

ANDREW J. C. KUNIAN,
LOIS R. KUNIAN,
KEITH BAINBRIDGE,
KENT A. STRONG AND
EZA A. GADSON AS REPRESENTATIVE OF
THE ESTATE OF JAMES BOYD GADSON

**Plaintiffs**

v.

FRANCIS X. SMOLLON,
COLIN B. WILLIAMS,
EOS LNG GROUP LLC,
EOS INVESTMENT GROUP LLC,
ZUBIN KHAMBATA,
TILDEN ENERGY, LLC
SFXS MARKETING GROUP LLC, and
EAGLE POINT ENERGY HOLDINGS LLC

**Defendants**

---

## VERIFIED COMPLAINT
## FOR EQUITABLE RELIEF AND DAMAGES
## DEMAND FOR JURY TRIAL

### CONTENTS

INTRODUCTION ................................................................................................................ 1

SUMMARY OF THE ALLEGATIONS ............................................................................. 1

PARTIES ............................................................................................................................. 3

    I.   Plaintiffs ................................................................................................................. 3

    II.  Defendants ............................................................................................................. 3

JURISDICTION AND VENUE ......................................................................................... 5

i

FACTS COMMON TO ALL COUNTS................................................................ 5

I.     JOINT VENTURE FORMATION AND STRUCTURE ...................................... 5

    A.   In 2012 and 2014, Kunian Formed Eos LNG LLC and Eos Infraestructure LLC to Develop and Operate an LNG Export/Import Business ........................ 5

    B.   Kunian, Smollon and Williams Form Partnership to Develop the LNG Export-Import Venture................................................................................................ 6

    C.   In Early 2015, Kunian and Smollon Secured Counterparty Agreements for the Kunian Companies to Develop an LNG Import Terminal and Supply the LNG for That Terminal.......................................................................................................... 7

        1.   The Eos INFRA – CRI Terminal Development Agreement........................ 7

        2.   The 20 Year Exclusive LNG Supply and Terminal Use Agreements .......... 8

    D.   During 2015, Eos LNG and Eos INFRA Developed a Portfolio of Investors and Future Financing Opportunities for the Chilean LNG Export/Import Venture ......... 9

        1.   Cash Capital Contributions to Eos INFRA from Plaintiffs and Argo Trading.............................................................................................................. 9

        2.   Additional Kunian Company Contractual and Financing Commitments and Opportunities.................................................................................................. 10

    E.   By January 2016 Eos INFRA Had Contractual Relationships and Financing Commitments and Opportunities Essential to a Successful Venture....................... 11

II.    IN JANUARY 2016, SMOLLON AND WILLIAMS INITIATED A SCHEME TO FREEZE THE PLAINTIFFS OUT THE CHILEAN LNG EXPORT-IMPORT VENTURE.................................................................................................................. 12

    A.   Smollon and Williams Formed Copycat Companies to Replace Kunian's Eos LNG and Eos INFRA Companies.......................................................................... 12

    B.   Smollon and Williams Persuaded CRI to Replace the Kunian Companies with the Smollon-Williams Companies as CRI's Partners in the LNG Terminal Development Venture. ........................................................................................ 14

    C.   Smollon and Williams Usurped the Kunian Companies' Interests in the LNG Supply Contract and Terminal Use Agreement .................................................... 16

    D.   The Counterparty Contract Structure Before and After the Freeze-Out........... 17

    E.   Smollon and Williams Misappropriated the Eos INFRA Investors' Capital Contributions and Financing Commitments ........................................................ 17

        1.   Theft of Capital Contributions.................................................................. 17

        2.   Smollon and Williams Converted Eos INFRA's Venture Financing Commitments to Eos INVEST.......................................................................... 18

        3.   Smollon and Williams Usurped Capital Contributions and Investment Opportunities in Excess of $3 Million.............................................................. 18

    F.   Theft of the Kunian Companies' Good Will........................................................ 19

III.     SMOLLON AND WILLIAMS  CONCEALED THE FACT THAT PLAINTIFFS NO LONGER HAVE EQUITY IN THE EOS LNG EXPORT-IMPORT VENTURE ........................................................................................ 19

    A.     Smollon's False Explanation for Forming Eos INVEST and Eos LNG Group 20

    B.     Smollon and Williams Have Repeatedly Given False Assurances that Plaintiffs Will Receive Future Equity Allocations .................................................... 22

    C.     Smollon Has Formulated Plans to Transfer Stock He Controls in the LNG Export-Import Venture and Threated to Invoke Them ............................................ 25

CAUSES OF ACTION ......................................................................................... 26

DEMANDS FOR RELIEF .................................................................................... 31

JURY DEMAND .................................................................................................. 34

VERIFICATION.................................................................................................... 35

## INTRODUCTION

This is an action for injunctive relief and damages arising from a breach of fiduciary duty perpetrated by the defendants Francis X. Smollon and Colin B. Williams, who, with the plaintiffs, were members of a closely held joint venture and associated limited liability companies which were developing a liquid natural gas (LNG) export-import business. The principal defendants, Francis X. Smollon and Colin B. Williams froze the plaintiffs out by of the venture by forming new limited liability companies with the aid and assistance of their co-defendants from which they excluded the plaintiffs from membership and participation.

## SUMMARY OF THE ALLEGATIONS

1.      In 2012, Plaintiff Andrew Kunian, an investment and finance professional, turned to the development of an international Liquid Natural Gas ("LNG") export-import business in response to a worldwide shortage of LNG stemming from the nuclear accident in Fukushima, Japan.

2.      To that end, Kunian organized two limited liability companies: Eos LNG LLC in 2012 and Eos Infraestructure ("Eos INFRA") LLC in 2014 (collectively, the "Kunian companies"). He then purchased options to lease land in Texas for development of an export facility and secured LNG export permits from the U.S. Department of Energy.

3.      In 2014, the defendants Francis Smollon and Colin Williams separately approached Kunian to join his project.

4.      In or about February 2015, the three agreed to jointly pursue a venture to export LNG from the United States and import it into Chile. Accordingly, Kunian agreed to

grant Smollon and Williams equity interests and management positions in his two companies.

5.      In February 2015, Kunian and Smollon secured critical long-term contracts with Chilean counterparties, including a joint venture agreement to develop, own and operate an LNG import terminal in Concepcion, Chile, and a 20-year exclusive right to supply LNG to that terminal.

6.      With development and supply contracts in hand, the Kunian companies began attracting investors to fund the project design, engineering, and permitting phases.  By late 2015, they had established a contractual framework and secured financing commitments that presaged a successful and rewarding venture.

7.      In early 2016, Smollon and Williams falsely told Kunian that their principal Chilean counterparty required that they form new entities to own and manage the LNG project.  Under this pretext, Smollon and Williams organized two new companies: Eos LNG Group LLC and Eos Investment Group LLC (collectively, the "Smollon-Williams companies").

8.      These two new entities were carbon copies, in name and substance, of the Kunian companies.  The sole difference was that Smollon and Williams secretly acquired or controlled virtually all of the membership interest and granted the plaintiffs nothing.

9.      Smollon and Williams appropriated all of the Kunian companies' assets - the Chilean contracts to develop, own and operate the LNG import terminal, the twenty-year exclusive LNG supply contract, the cash-in-hand capital contributions, the future financing opportunities and commitments - to their Smollon-Williams companies which left the Kunian companies stripped of their assets and worthless.

2

10.     Since early 2016 and continuing into 2018, Smollon and Williams have assured the plaintiffs that their equity in the Kunian companies would be formally documented in the Smollon-Williams companies, but have failed, despite repeated demands, to do so.

11.     By freezing the Plaintiffs out of the LNG venture, Smollon and Williams breached their contractual and fiduciary obligations to the plaintiffs.

12.     The other named defendants conspired with and knowingly and intentionally aided and abetted the defendants in the freeze-out and also stand as fraudulent transferees of those interests and assets which Smollon and Williams converted and transferred to the Smollon-Williams companies.

## PARTIES

### I.   PLAINTIFFS

13.     Plaintiff Andrew J.C. Kunian is a natural person domiciled in Boston, Massachusetts.

14.     Plaintiff Lois R. Kunian is Andrew Kunian's mother and a natural person domiciled in Boston, Massachusetts.

15.     Plaintiff Keith Bainbridge is a natural person domiciled in London, United Kingdom.

16.     Plaintiff Kent A. Strong is a natural person domiciled in New York, NY.

17.     Plaintiff Eza A. Gadson is a natural person domiciled in North Carolina and is the representative of the estate of his father, James Boyd Gadson.

### II.   DEFENDANTS

18.     Defendant Francis X. Smollon is a natural person domiciled at 14 Brandon Road, Lawrenceville, New Jersey 08648.

3

19.     Defendant Colin B. Williams is a natural person domiciled at 8703 Shadow Lane, Richmond, Virginia 23229.

20.     Defendant Eos Investment Group LLC ("Eos INVEST") is a limited liability company organized under the laws of Delaware with a principal place of business at the residential address of defendant Williams, 8703 Shadow Lane, Richmond, Virginia 23229.

21.     Defendant Eos LNG Group LLC ("Eos LNG Group") is a limited liability company organized under the laws of Delaware with a principal place of business at the residential address of defendant Williams, 8703 Shadow Lane, Richmond, Virginia 23229.

22.     Tilden Energy Group LLC ("Tilden") is a limited liability company organized under the laws of Virginia with a principal place of business at 8703 Shadow Lane, Richmond, Virginia 23229.  It is the alter ego of defendant Williams, who is the sole member of the company and its registered agent at that same address.

23.     SFXS Marketing Group LLC is a limited liability company with a principal place of business at 1 Craven Lane, Suite 6276, Lawrence, New Jersey 08648.  It is the alter ego of defendant Smollon, whose son, Sean F.X. Smollon, is the sole member of the company and whose wife, Dominique Smollon, is the company's registered agent at that address.

24.     Eagle Point Energy Holdings LLC is a limited liability company with a principal place of business at 6 Humbert Lane, Princeton, New Jersey 08452.  Its registered agent is defendant Francis Smollon, 1 Craven Lane, Lawrenceville, New Jersey.

25.    Zubin Khambata is a natural person whose last known domicile is at 26 Crown Terrace, Yardley, Pennsylvania 19067, but who on information and belief is now a resident of Chile.

## JURISDICTION AND VENUE

26.    This Court has jurisdiction of the subject matter of this action under Mass. G.L. c. 231A, §1; Mass. G.L. c. 212, §§ 3-4 and Mass. G.L. c. 214,§ 3.

27.    The amount in controversy exceeds $25,000.

28.    Mass. G.L. c. 223A, Section 3 confers personal jurisdiction over the defendants for causing tortious injury in the Commonwealth.

29.    Venue is proper under Mass. G.L. c. 223, §1.

## FACTS COMMON TO ALL COUNTS

I.    JOINT VENTURE FORMATION AND STRUCTURE

### A. In 2012 and 2014, Kunian Formed Eos LNG LLC and Eos Infaestructure LLC to Develop and Operate an LNG Export/Import Business

30.    In 2012, prompted by world-wide LNG shortages triggered by the recent Fukushima nuclear accident in Japan, plaintiff Andrew Kunian founded a business venture to export LNG from the United States into foreign countries needing new LNG sources of supply.

31.    In 2012, Kunian formed Eos LNG LLC ("Eos LNG") with plaintiffs Strong and Gadson, and the three became the company's sole equity members.

32.    In August 2013, Kunian, seeking an LNG export facility for Eos LNG, purchased an option to lease a parcel of land in Brownsville, Texas.  He then applied for and, in November 2013, obtained an LNG export permit for Eos LNG from the U.S. Department of Energy.

33.     In 2014, Kunian formed Eos Infraestructure LLC ("Eos INFRA") (originally formed by Kunian as VGS Barca LNG LLC and renamed in 2015.)  Initially, Kunian was the sole equity member in Eos INFRA.

34.     Eos LNG and Eos INFRA (collectively the "Kunian companies") have, at all times material to these events, maintained a principal place of business at 308 Marlborough Street, Boston, Massachusetts in accordance with the terms of their respective operating agreements.

35.     The number of members in each of Eos LNG and Eos INFRA never exceeded five.  Each was managed at all times material hereto by a substantial majority of its members and no ready market existed for its units of limited liability company membership interests.

**B.  Kunian, Smollon and Williams Form Partnership to Develop the LNG Export-Import Venture**

36.     In or about 2014, defendant Francis Smollon ("Smollon") and defendant Colin Williams ("Williams") separately and independently approached Kunian and expressed interest in joining his LNG export/import venture.

37.     In early 2015, Kunian, Smollon and Williams agreed to pursue the LNG venture jointly as common law partners.  They agreed to share the profits and equity equally in the venture and in any special purpose entity they used or formed to pursue it.

38.     In February 2015, Kunian, Gadson and Strong transferred portions of their equity interests in Eos LNG to Smollon.

39.     Shortly thereafter, Williams assumed the title of president and managing partner of Eos LNG (but never formalized his equity interest.)

40.     In or about May 2015, after securing the Chilean counterparty agreements described below, Smollon, Williams and Kunian adopted an operating agreement for Eos INFRA.  Copies of relevant pages of the Eos INFRA Operating Agreement are attached hereto at Exhibit A.

41.     The Eos Infra Operating Agreement provides that "the principal office of the Company shall be at 308 Marlborough Street, Boston, Massachusetts 02116 or such other place or places as the Managers from time time determine."  See Exhibit A, page 1.

42.     The Eos INFRA Operating Agreement, designated Kunian, Smollon and Williams as the company managers and awarded 2050 units to each a corresponding to a 20.5% equity interest in the company.  The remaining 3850 units corresponding to 38.5% equity interest were reserved as treasury units for allocation to future investors. See Exhibit A, pages 34-35.

C. **In Early 2015, Kunian and Smollon Secured Counterparty Agreements for the Kunian Companies to Develop an LNG Import Terminal and Supply the LNG for That Terminal**

43.     Smollon, who had some prior experience in the LNG industry, proposed that Chile serve as the venture's LNG import site.

44.     In February 2015, Kunian and Smollon traveled to Chile, where, on behalf of the Kunian companies, they negotiated three key agreements with Chilean counterparties: a Terminal Development Agreement, an exclusive LNG Supply Agreement, and an LNG Terminal Use Agreement.

### 1.   The Eos INFRA – CRI Terminal Development Agreement

45.     Eos INFRA and Compania Regional de Infraestructuras  S.A ("CRI") entered into a Memorandum of Agreement ("MOA") dated as of January 27, 2015. Under the CRI

7

MOA, CRI and Eos INFRA agreed to form and jointly own a new company, GNL del Bio Bio S.p.A.

46.     The MOU provided that GNL del Bio Bio would develop, own and operate an LNG import and regassification terminal in Concepcion, Bio Bio Region, Chile.

47.     By the terms of the MOU, Eos INFRA initially acquired a 45% equity interest in GNL del Bio Bio and CRI acquired 55% equity interest.

48.     In connection with the MOU, Kunian granted Juan Ignacio Ugarte Jordana ("Jordana"), a Chilean citizen, a limited power of attorney, dated February 13, 2015, which authorized Jordana to execute a set of foundational documents for the establishment of GNL del Bio Bio S.A. of which Eos Infraestructure LLC was a Founding Shareholder.

## 2.   The 20 Year Exclusive LNG Supply and Terminal Use Agreements

49.     Eos LNG (as Seller) and Gas Natural Del Bio Bio S.p.A. (as Buyer) entered into an LNG Sale and Purchase Agreement dated February 26, 2015 (the "LNG Supply Agreement").

50.     Eos LNG, Natural Gas del Bio Bio, S.p.A, and GNL del Bio Bio, S.p.A also entered into an LNG Terminal Use Agreement dated June 23, 2015 (the "Terminal Use Agreement").

51.     Under these two agreements, Eos LNG acquired the rights to use the terminal and the exclusive right to supply LNG to the venture for twenty years.

52.     The LNG Supply Agreement calls for Eos LNG to deliver a total quantity of 3,475,000,000 mm BTUs (One Million British Thermal Units) of LNG over the life of the contract.  At current market prices, the plaintiffs estimate that the LNG Supply

Agreement in conjunction with the Terminal Use Agreement would generate gross revenues over the twenty-year life of the contracts in excess of twenty billion dollars and produce net profits in excess of one billion dollars.

### D. During 2015, Eos LNG and Eos INFRA Developed a Portfolio of Investors and Future Financing Opportunities for the Chilean LNG Export/Import Venture

#### 1. Cash Capital Contributions to Eos INFRA from Plaintiffs and Argo Trading

53.     Claiming to be an experienced investment banker, Williams assumed principal responsibility for raising capital for the LNG venture.

54.     In late Summer 2015, Kunian secured cash investments for Eos INFRA from plaintiff Lois Kunian, who contributed $50,000 for 200 membership units, a 2% equity interest in the LNG export/import venture.

55.     Kunian also secured an investment from plaintiff Keith Bainbridge, an internationally respected expert authority on the subject of LNG shipping and transport. Bainbridge contributed $100,000 for 400 membership units.  Bainbridge also was awarded an additional 300 units for serving as a project consultant and advisor for the venture.  As a consequence of the foregoing, Bainbridge acquired 700 points in Eos INFRA entitling him to  a 7% equity interest in the LNG export/import venture.

56.     In addition, Varun and Nakel Arya, brothers doing business as Argo Trading ("Argo"), entered into a Memorandum of Understanding with Eos INFRA dated August 24, 2015, in which Argo (or its designee) agreed to provide Eos INFRA with between $2M and $6M in venture financing.

57.     In late August 2015, Argo made the first of ten cash advances to Eos INFRA which, by April 2016, totaled $499,900.

58.    In a letter to CRI General Manager Juan Francisco Sanchez, dated October 28, 2015, Williams outlined his efforts to raise investment financing for the venture and described Argo Trading as the venture's "primary" and "major" funding source.

59.    Two days later, on October 30, 2015, Kunian and Williams wrote to CRI's founder, Juan Francisco Ugarte, informing him that a consortium of investors from India that included Argo Trading had agreed to finance the LNG venture with $3 million for the early phases of the terminal development.

60.    Williams himself also made a cash capital contribution to the venture in October 2015 of $20,000.

### 2.    Additional Kunian Company Contractual and Financing Commitments and Opportunities

61.    By October 2015, Williams had developed Magnolia LNG LLC, a Delaware company, as a source of LNG that would enable Eos LNG to meet its obligations under the LNG Supply Agreement.  Several months later, Williams would misappropriate that opportunity by consummating a formal LNG supply agreement between Magnolia and the Smollon-Williams companies.

62.    By early September 2015, Williams had identified the Stream Companies ("Stream") as a potential investor in the venture and shortly thereafter, Stream began conducting due diligence examination of the project.

63.    By October 28, 2015, Williams identified Stonepeak Infrastructure Partners ("Stonepeak"), a New York private equity firm, as likely to invest from $50 to $150 million in Eos INFRA.

64.    Throughout the Fall of 2015, Williams advised CRI of Eos INFRA's progress in raising investment capital.  In his letter to CRI of October 28, 2015, Williams specifically

informed CRI that he was "bringing Magnolia LNG to the table" to lend credibility to the project with major investors such as Stonepeak, and that he expected Stonepeak to become a major investor in the venture.

65.    In a December 31, 2015 power point presentation for prospective investors entitled "Executive Summary 2015," Williams described Stonepeak (misnamed or misspelled "Peakstone") as an owner of Eos LNG that had committed to a $50 million investment in the venture.

### E. By January 2016 Eos INFRA Had Contractual Relationships and Financing Commitments and Opportunities Essential to a Successful Venture

66.    By January 2016, Eos LNG and Eos INFRA had the following assets, agreements and financing commitments in place:

   a.   An amended LNG terminal development agreement with CRI, increasing Eos INFRA's equity in the GNL del Bio Bio LNG import terminal to 51% and reducing CRI to 49%. [1]

   b.   The Eos LNG – GNL del Bio Bio Terminal Use Agreement;

   c.   The Eos LNG – Gas Natural del Bio Bio 's twenty-year exclusive LNG supply contract;

   d.   Cash investments from plaintiffs Bainbridge and Lois Kunian and from Williams and Argo Trading;

   e.   Ongoing, confirmed or pending commitments for venture capital from Argo Trading, the Stream Family, and Stonepeak LLC; and

---

[1] Smollon confirmed this percentage in a December 2, 2015 email to Argo Trading, and it is also reflected in the draft Amended and Restated Memorandum of Agreement between Eos INFRA and CRI.

    f.  A commitment from Magnolia LNG to supply LNG to the venture ensuring that EOS LNG would be able to meet its initial contractual LNG supply obligations.

67.    In January 2016, Williams sent e-mails to a Koch Industries executive and an Eos INFRA investment broker confirming that the venture had sufficient capital to obviate the need for additional equity financing.

68.    In short, by January 2016, the Kunian companies had formed a business structure to export and supply LNG to Chile, created a significant funding base, and secured access to a Chilean import terminal and an exclusive LNG supply contract for the next 20 years.

## II.  IN JANUARY 2016, SMOLLON AND WILLIAMS INITIATED A SCHEME TO FREEZE THE PLAINTIFFS OUT THE CHILEAN LNG EXPORT-IMPORT VENTURE

69.    In early 2016, defendants Smollon and Williams initiated a secret scheme to convert ownership and control of the entire LNG venture to themselves by forming two new limited liability companies that were carbon copies of Eos LNG and Eos INFRA to which they allocated all the equity interests to themselves through four other defendants they own or control.

70.    Smollon and Williams then converted and transferred all of the assets of Eos LNG and Eos INFRA to these new entities, robbing plaintiffs of their beneficial share of the LNG venture and leaving the original companies worthless.  The following allegations detail the steps Smollon and Williams took to achieve those ends.

### A.  Smollon and Williams Formed Copycat Companies to Replace Kunian's Eos LNG and Eos INFRA Companies.

71.    On February 18, 2016, Smollon and Williams formed two new companies by registering them with the Delaware Secretary of State:  Eos LNG Group LLC ("Eos LNG

Group") and Eos Investment Group LLC ("Eos INVEST"), (collectively the "Smollon-Williams" companies.)

72.     Also, on February 18, 2016, without informing the plaintiffs, Smollon and Williams executed an operating agreement for Eos INVEST. The Eos INVEST operating agreement designates Williams as the LLC president and Smollon as vice president, and allocates 100 percent of that company's equity in equal shares to defendant Zubin Khambata and the three defendant companies, Tilden Energy Group LLC ("Tilden"), SFXS Marketing Group LLC ("SFXS") and Eagle Point Energy Holdings LLC ("Eagle Point"). Copies of the Eos INVEST Operating Agreement cover pages, signature page, and equity distribution schedule are attached as **Exhibit B.**

73.     Those three defendant companies are either owned or controlled by, or linked to, Smollon or Williams:

> a. Sean F. X. Smollon, son of the defendant Frances X. Smollon, is the sole member of SFXS Marketing Group LLC.
>
> b. The defendant Colin B. Williams is the sole member of Tilden Energy Group.
>
> c. Eagle Point Energy Holdings LLC, a New Jersey Company, lists defendant Francis Smollon as its resident agent with the New Jersey Department of State.

74.     On information and belief, none of these four defendants contributed capital in exchange for their 25% equity interest in the Smollon-Williams companies.

75.     Plaintiffs allege that defendants Khambata, Tilden, SFXS and Eagle Point acquired their collective 100% investment interest in Eos INVEST as alter egos or agents of Smollon and/or Williams.

76.     On information and belief, Smollon, Williams and Khambata created a similar ownership structure in Eos LNG Group, i.e., where they own or control all of the membership interest.

77.     Smollon and Williams allocated no equity in the Smollon-Williams companies to the plaintiffs and on information and belief do not intend to do so.

78.     Plaintiffs allege that defendants Smollon and Williams fraudulently placed their ownership interests in Eos INVEST and Eos LNG Group with their alter egos or agents they control to put their interests in Eos INVEST, Eos LNG Group and the venture beyond the reach of creditors and, particularly, the plaintiffs in order to allow them to transfer and/or dispose of their interests in the venture rapidly and without notice to the Plaintiffs.

79.     As a consequence of the foregoing, Defendants Khambata, Tilden, SFXS and Eagle Point acquired those interests as fraudulent transferees.

**B.   Smollon and Williams Persuaded CRI to Replace the Kunian Companies with the Smollon-Williams Companies as CRI's Partners in the LNG Terminal Development Venture.**

80.     Beginning in January 2016, Smollon and Williams methodically usurped and converted to themselves, through Eos INVEST and Eos LNG Group, the joint venture relationship that Eos INFRA and Eos LNG had established with CRI.

81.     On or about January 26, 2016, a new Chilean company, GNL Talcahuano S.p.A,
emerged to assume GNL del Bio Bio's role as the Chilean LNG terminal developer,
owner and operator.

82.     On February 26, 2016, Smollon and Williams signed a new Binding Development
Agreement (the "Development Agreement") between CRI and Eos INVEST.

83.     Under the 2016 new Development Agreement, Eos INVEST supplanted Eos
INFRA as CRI's joint development partner in the Chilean LNG import terminal as the
original January 2015 MOU between CRI and Eos INFRA had provided.[2]

84.     The Development Agreement designates GNL Talcahuano as the developer,
owner and operator of the LNG venture's import terminal thereby replacing GNL del Bio
Bio.

85.     The Development Agreement also provides that CRI and Eos INVEST will
jointly own GNL Talcahuano SpA, again, replacing Eos INFRA in that role.

86.     The Development Agreement increased Eos INVEST's equity in the LNG import
terminal owner (i.e. GNL Talcahuano) to 52% and reduced CRI's interest to 48% in
contrast to the equity percentages allocated under the Eos INFRA – CRI MOU of January
2015 as subsequently amended.

87.     Two months later, on April 29, 2016, Williams executed a stockholder agreement
granting Eos INVEST 1,083 preferred shares of GNL Talcahuano, shares in the LNG
terminal owner/developer previously pledged to Eos INFRA under the original January
2015 MOU with CRI.[3]

---

[2] See paragraphs 43-48 above.
[3] See paragraphs 45-48 above.

88.     Smollon and Williams undertook the foregoing actions described in paragraphs 80 through 87 in secret without the plaintiffs' knowledge or approval.

### C. Smollon and Williams Usurped the Kunian Companies' Interests in the LNG Supply Contract and Terminal Use Agreement

89.     Having appropriated Eos INFRA's terminal development project, Smollon and Williams also usurped Eos LNG's interest in the twenty-year LNG Supply and Terminal Use agreements.

90.     The Eos INVEST – CRI Development Agreement specifically directs GNL Talcahuano to execute new terminal use and LNG supply contracts with Smollon-Williams's Eos LNG Group.

91.     To that end, between February 18 and February 26, 2016, defendant Williams, on behalf of Eos LNG Group, executed the following contracts with Gas Natural del Bio Bio and GNL Talcahuano:

(1) An LNG Supply Contract, which replaced Eos LNG with the Smollon-Williams' doppelganger, Eos LNG Group; and

(2) A new LNG Terminal Use Agreement, which replaced Eos LNG with the Smollon-Williams' Eos LNG Group.

92.     In the execution of these agreements Smollon and Williams usurped and converted plaintiffs' equity in the development, ownership, operation and profits of the Chilean LNG import terminal.

93.     Smollon and Williams carried out the appropriation and conversion of the LNG Supply Agreement and the Terminal Use Agreement in secret and without informing the plaintiffs of their actions and without their approval.

### D.   The Counterparty Contract Structure Before and After the Freeze-Out

94.   Attached at **Exhibit C** is a chalk which accurately depicts the contractual relationships among and between the so-called Eos companies and the Chilean counterparties before and after the freeze-out.

### E.   Smollon and Williams Misappropriated the Eos INFRA Investors' Capital Contributions and Financing Commitments

#### 1.   Theft of Capital Contributions

95.   Smollon and Williams also appropriated the venture capital investment funds advanced by plaintiffs Bainbridge and Lois Kunian, and by defendant Williams himself.

96.   Argo Trading, which began making monthly advances of $50,000 to Eos INFRA in August 2015, continued making those payments through April 2016.

97.   Instead of immediately refunding the Argo Trading, Lois Kunian and Bainbridge capital contributions, which amounted to nearly $500,000 by January 2016, the Smollon-Williams companies retained those funds and treated them as their own,

98.   Smollon and Williams did not inform Bainbridge or Lois Kunian of what they had done with their investments until September 2016.  In September, Williams suggested that he refund those investments or convert them to a 1% equity interest for Bainbridge and a .5% equity interest for Lois Kunian.  He gave no explanation or justification for reducing or proposing to reduce their respective equity by 75% of their original equity in Eos INFRA.[4]

---

[4] Ultimately, Smollon and Williams gave Bainbridge a partial refund of his investment in the venture but failed to credit him with the increased valuation that the venture had by then accrued.  Nor did they redeem or make provision for the equity he acquired in respect of his consulting services.  By reason thereof, Bainbridge is entitled to no less than a 3% equity interest in the venture.

## 2. Smollon and Williams Converted Eos INFRA's Venture Financing Commitments to Eos INVEST.

99.     In 2015, Williams, acting for Eos INFRA, developed venture financing opportunities with Stonepeak Infrastructure Partners and the Stream Companies.[5]

100.    On January 22, 2016, Williams, now acting on behalf of Eos INVEST (although he had yet to register Eos INVEST with the Delaware Secretary of State), executed an investment term sheet with Trent Vichie, Stonepeak's Senior Managing Partner.

101.    The Stonepeak Investment Term Sheet committed Stonepeak to a capital investment of no less than $50M and up to $150M, an amount sufficient to fund from 50% to 100% of the capital requirements to develop and operate the LNG terminal.

102.    In approximately April 2016, Williams, again on behalf of Eos INVEST, signed a term sheet with the Stream Companies, who Williams first identified in September 2015 as a significant investment opportunity for Eos INFRA. (See paragraph 62 above.)

103.    In the Stream Companies term sheet, Stream committed to provide between $2 million and $2.5 million of investment capital to the Smollon-Williams companies, and advanced its first $50,000 payment in early May 2016.

## 3. Smollon and Williams Usurped Capital Contributions and Investment Opportunities in Excess of $3 Million

104.    Between the months of August 2015 and October 2017, Eos INFRA transferred $3,189,877 to CRI or its affiliates in fulfillment of the investment financing terms of the Memorandum of Agreement Eos INFRA reached with CRI in February 2015.   This amount included investments by Plaintiffs Lois Kunian and Keith Bainbridge, by the

---

[5] See paragraphs 61-65 above.

Defendant Colin Williams, by Argo Trading and its affiliates and by the Stream
Companies.

105.    On information and belief, Smollon and Williams applied the above described
funds to meet financial obligations the Smollon-Williams companies undertook under the
terms of the Binding Development Agreement they executed with CRI in February 2016.

### F.  Theft of the Kunian Companies' Good Will

106.    Throughout 2016 and thereafter, Smollon and Williams have traded and continue
to trade on the goodwill generated by the Kunian companies by using the moniker "Eos"
or "Eos LNG" when referring to the Smollon-Williams companies and their respective
roles and activities and using "Eos LNG" letterhead on their correspondence with third
parties.

107.    To this day, Smollon and Williams continue to use the "eoslng.com" Internet
domain name which Kunian registered in April 2012 and continues to maintain.
Likewise, Smollon and Williams also continue to use e-mail accounts that Kunian
established as the domain administrator on the eoslng.com domain.

### III.    SMOLLON AND WILLIAMS  CONCEALED THE FACT THAT PLAINTIFFS NO LONGER HAVE EQUITY IN THE EOS LNG EXPORT-IMPORT VENTURE

108.    From February 2016 to the date of the filing of this complaint, defendants
Smollon and Williams have actively concealed from plaintiffs the fact that plaintiffs no
longer hold any equity interest in the LNG venture.

109.    To delay the inevitable discovery of their illicit misdeeds, Smollon and Williams
have repeatedly conveyed false and misleading assurances to the Kunians that no one has
yet been granted equity in the Smollon-Williams companies, but that they are nearing a

date when they will do so and award the plaintiffs their appropriate share on those interests.

110.    Smollon and Williams conveyed false statements concerning the reasons for forming the new Eos entities, false statements concerning the status of equity distributions in those companies, false promises and assurances that equity distributions to the plaintiffs would be made in the foreseeable future, and false promises regarding the circumstances under which such equity distributions would take place. The Defendants made the majority of those false statements in e-mail messages and phone calls they directed into Massachusetts to Kunian and Kunian's father with the intention that they would rely on them by not insisting upon more definitive information and evidence of good faith that likely would have revealed the true state of affairs.

111.    Those assurances are belied by the fact that, as set forth above, when Smollon and Williams formed Eos LNG Group and Eos INVEST on February 18, 2016, they adopted an operating agreement that divided the Eos INVEST membership interest equally among the defendants Khambata, Tilden, SFXS and Eagle Point, a fact they continue to withhold from the plaintiffs.

### A. Smollon's False Explanation for Forming Eos INVEST and Eos LNG Group

112.    Late on that same date of February 18, 2016 day Smollon and Williams formed Eos INVEST and Eos LNG Group, Smollon sent Kunian and Williams an e-mail claiming that CRI executive Juan Francisco Sanchez had become impatient with the fundraising progress and was "pushing to move forward, with us as greatly reduced shareholders, in a new vehicle, 'Eos Investments' . . . He (Juan Francisco) is going to

want to form this entity and have it become the counterparty in the terminal deal, with

him and his guys and Stonepeak taking the big pieces and them putting the funding in."

113.    In that same e-mail of February 18, 2016, Smollon also claimed that Eos INFRA

had failed to meet the terms of the CRI/Eos INFRA Memorandum of Agreement, and

that he, Kunian and Williams would be significantly diluted.

114.    Smollon added, in this email, that "We will get [what] the $500K get[s] us,[6] plus

some, so it won't be a home run, but it will leave [plaintiffs] Keith and Andrew's Mom

good and give us each something that will pay a couple of million a year or more. . . He

wants to do the same with Eos LNG."

115.    The language of Smollon's February 18, 2016 e-mail plainly implies that Smollon,

Williams and Kunian would share equally in any dilution of their membership interests in

the Kunian companies.

116.    This February 18, 2018 email is the first mention of Eos Investments and Eos

LNG Group to any of the plaintiffs.

117.    Kunian replied immediately to Smollon's e-mail, asking him to explain why new

entities were necessary.  Neither Smollon nor Williams responded.

118.    Smollon's assertion that CRI intended to form two new companies is

demonstrably false, as he and Williams had already formed Eos LNG Group and Eos

INVEST and, significantly, CRI has no equity interest in Eos INVEST and, on

information and belief, no interest in Eos LNG Group.

---

[6] The "500K" refers to the cash raised from investments by Argo Trading, Bainbridge and Lois Kunian.

119.    Smollon's claim that CRI had instigated the formation of the new entities is
further belied by the following fact that, as of January-February 2016, CRI executives
were satisfied with the financing progress made by Eos INFRA.  More particularly,

    a.  Smollon and Williams had informed CRI prior to the formation of the
Smollon-Williams companies that funding sufficient to satisfy the
terms of the 2015 CRI-Eos INFRA MOU was already in place or
pending from Argo, Stonepeak and Stream.

    b.  The January 22, 2016 Stonepeak investment term sheet had been in
existence for a month.  The Stream Companies investment was already
in due diligence stage and lead to a term sheet signed in or about April
or May 2016.  In short, the initial financing commitments were in
place and both promised to provide sufficient investment financing to
assure the venture's success as of that point in time and satisfied the
terms of the CRI/Eos INFRA 2015 Memorandum of Agreement.

    c.  Smollon and Williams were already negotiating the replacement
Binding Development Agreement with CRI which became effective as
of February 26, 2016.

    d.  The new Development Agreement provided an increase, not a
decrease, in Eos INVEST's share of equity in the LNG import
terminal.

## B.  Smollon and Williams Have Repeatedly Given False Assurances that Plaintiffs Will Receive Future Equity Allocations

120.    Following Smollon's February 18, 2016 e-mail, Kunian called Smollon monthly,
seeking documentation of his and Lois Kunian's equity interest in the new entities.  In the

course of those phone calls, Smollon repeatedly assured Kunian that, once the equity allocation had been formalized, Kunian would receive the documentation.

121.    On July 25, 2016, Williams responded to a status request from Kunian by e-mail stating that a "predevelopment capital" term sheet was under negotiation, that "the agreement should be finalized by late August so I should be able to get you some clarity then."

122.    On January 9, 2017, Stephen Kunian, an attorney and  Kunian's father, sent Williams an e-mail containing a detailed list of questions which included the following:

   a.   "Why are we [i.e., Lois Kunian] getting .5% stake in EOS Investment Group instead of EOS Infraestructure?"

   b.   "When will we be getting these shares?"

   c.   "Can I review the corporate charter and operating agreement of EOS Investment Group?"

123.    On February 6, 2017, Williams e-mailed Stephen Kunian a response to those and other questions.  Williams stated, in relevant part, that "[s]**hares have not been distributed to any of the owners, including the majority shareholder. . .**" (emphasis added.)  That statement was patently false; Eos INVEST operating agreement of February 18, 2016 had already allocated 100% of those interests.

124.    In his February 6, 2017 e-mail, Williams also falsely claimed that Eos LNG and Eos INFRA had failed to meet the financing terms of the January 2015 MOU between Eos INFRA and CRI, and as a result, the opportunity for Eos INFRA to remain in the project "expired."

23

125.    In fact, throughout the Fall of 2015 and continuing into April 2016, Argo Trading had been making regular investment payments of $50,000 per month and Williams' had informed CRI that financing commitments from the Stream Companies and Stonepeak were in progress.  Moreover, under the new Binding development Agreement between Eos INVEST and CRI signed as of February 26, 2016, the Eos ownership in the Chilean LNG import terminal increased to 52%.

126.    On April 25, 2017, Williams responded by e-mail to a further request from the plaintiffs for a status report of the equity distribution.  In e-mail on that date, Williams stated, in part, that, "We are finalizing the remaining equity tranche in conjunction with our EIS award in mid-June.  My anticipation would be to be able to issue the shares in conjunction with that event in roughly six weeks' time.  I will be in touch closer to the date."

127.    Thereafter, Williams failed to volunteer any further information on his own initiative despite his assurance that he would "be in touch."

128.    On January 5, 2018, Williams responded to a further request concerning the status of the promised equity distribution by statin.  Williams sent an e-mail to the Kunians that stated in relevant part,  "We are in the definitive document stage of which I anticipate closing by mid-Feb.  All share issuance will occur ahead or in concurrent with that event, so its happening in the next month.  I will keep you abreast of developments, but I do appreciate your patience."

129.    Despite the assurance repeated on that date, Williams has supplied the Plaintiffs with no further information concerning the venture.

130.    As recently as August 31, 2018, Smollon responded to a request from Andrew

Kunian to supply a status update by stating, in relevant part, "Shortly, we will have our

final basis in Eos Investment Group established and we will all get papered up."

### C. Smollon Has Formulated Plans to Transfer Stock He Controls in the LNG Export-Import Venture and Threated to Invoke Them

131.    In an e-mail dated August 24, 2018, Smollon sent to Defendant Khambata with a

copy to Defendant Williams, he revealed that he had formulated plans to sell stock and

equity that he owns or controls in the Venture to third parties who area beyond the reach

and jurisdiction of this Court should he decide to do so.

132.    More particularly, in that e-mail, Smollon wrote in pertinent par that,

> After some thought, . . . I am going to take certain actions, unilaterally, or in
> concert with Colin and yourself to exit this business, and wind up all business
> matters in Chile.
>
> My plan is that if there is not a new written agreement between Eos and CRI by
> next Friday, I am going to begin the process, and it will be quick, to sell ALL of
> the shares of SFXS and Eagle Point to one or more of the Five Families in
> Santiago.
>
> . . .
> Finally, I am going to sell the licens4s [sic] for Octcet and Wa[s]ter-to-Energy
> technology to the people in the Five Families as part of a package deal with the
> shares of SFXS and Eagle Point.

133.    A true copy of the foregoing e-mail is attached at **Exhibit D**.

134.    The foregoing e-mail also demonstrates that Defendants Smollon, Williams and

Khambata directly or indirectly jointly own and control more than fifty percent of the

equity in GNL Talcahuano and the entire LNG export-import venture.

135.    The foregoing e-mail further demonstrates that Smollon exercises dominant

control over the stock of the Defendants SFXS Marketing and Eagle Point Energy

Holdings, and that Smollon believes himself able to transfer or dispose of those entities and the equity they possess in Eos INVEST at will.

136.    Although in his e-mail, Smollon's conditioned his threat to dispose of his interests in the Venture on a future event, the message demonstrates that Smollon harbors an intention that he, Williams and Khambata are able and prepared to unilaterally dispose of the equity interest they hold directly or indirectly in the Venture without notice to or objection by the plaintiffs at any time they are inclined to do so.

137.    Plaintiffs are therefore at risk of irreparable harm resulting from the potential loss of all of their respective equity interests in the venture absent a preliminary injunction as herein requested.

## CAUSES OF ACTION

Based upon the allegations set forth above which are incorporated by reference in each of the following Counts, Plaintiffs assert the following causes of action:

### COUNT I
### BREACH OF CONTRACT
Kunian v. Smollon and Williams

138.    By reason of the foregoing, Smollon and Williams are in breach of their partnership agreement with Kunian.

139.    As a consequence thereof, Kunian has suffered substantial damages including the fair value of his equity percentage in the Venture in such amount as may be determined by a court or jury.

140.    Kunian has also been deprived of his right to participate in management and oversight of the LNG export/import venture.

## COUNT II
### BREACH OF FIDUCIARY DUTY
Kunian, Bainbridge, Lois Kunian, Gadson & Strong v. Smollon and Williams

141.    As common law partners in the Venture and as members of one or more closely

held business entities, Smollon and Williams owed a fiduciary duty to their fellow

partners and fellow members of Eos LNG and Eos INFRA, i.e. Plaintiffs Kunian,

Bainbridge, Lois Kunian, Strong and Gadson.

142.    Smollon and Williams breached those fiduciary duties by freezing the Plaintiffs

out of the LNG export/import Venture and out of those organizations and entities by,

inter alia, and as set forth in the Facts Common to All Counts, needlessly creating Eos

Investment Group and Eos LNG Group, usurping the assets of Eos LNG and Eos INFRA,

and depriving the Plaintiffs of their share of the rights, value and corresponding equity

enjoyed in those entities.

143.    As a further result of the foregoing tortious conduct, the Plaintiffs have suffered

damages in such amount as shall be determined by a court and jury.

## COUNT III
### AIDING AND ABETTING THE BREACH OF CONTRACT AND BREACH OF FIDUCIARY DUTY COMMITTED BY SMOLLON AND WILLIAMS
Kunian, Bainbridge, Lois Kunian, Strong and Gadson
v.
Khambata, Tilden Energy, SFXS Marketing, Eos Investment Group, Eos LNG Group, and Eagle Point

144.    For their part, Khambata, Tilden Energy, SFXS Marketing, and Eagle Point

acquired equity in Eos Investment Group after Eos Investment usurped the CRI contracts

for which they knowingly paid no money or other commensurate consideration or value.

145.    In so doing, Tilden, SFXS and Eagle Point knowingly and intentionally aided and

abetted Smollon and Williams in carrying out the Freeze-out Plan and in breaching their

contractual obligations and fiduciary duties to Plaintiffs.

146.    By reasons of the foregoing, each of the foregoing defendants is jointly and

severally liable to the Plaintiffs in such amounts as may be determined by a court and

jury.

**COUNT IV**
**CIVIL CONSPIRACY**
Kunian, Bainbridge, Lois Kunian, Strong and Gadson
v.
Smollon, Williams, Khambata, Tilden Energy, SFXS Marketing, and Eagle Point

147.    Smollon and Williams undertook the actions described above knowing and

intending to freeze the plaintiffs out of the LNG Export-Import Venture and conceal that

fact from the Plaintiffs.

148.    Likewise, SFXS Marketing, Eagle Point and Tilden Energy, respectively as alter

egos of Smollon and Williams who directly own or control those entities and who retain

the ability to control the disposition of the stock/and/or membership interests in those

entities, are charged with the same knowledge and state of mind possessed by Smollon

and Williams with regard to the freeze-out and equity transfers in Eos INVEST they

received via the Eos INVEST operating agreement.

149.    Defendants Khambata, Tilden Energy, SFXS Marketing and Eagle Point Energy

provided substantial assistance to the Defendants Smollon and Williams in perpetrating

the freeze-out of the Plaintiffs and the concomitant breach of fiduciary duty with full

knowledge of Smollon and Williams intentions to commit that tortious misconduct.

150.    As co-conspirators in the freeze-out, all such defendants are each jointly and

severally liable for all damages sustained by the plaintiffs proximately resulting from the

tortious conduct described in this Verified Complaint.

## COUNT V
## DECLARATORY JUDGMENT

Kunian, Bainbridge, Lois Kunian, Strong and Gadson
v.
Khambata, Tilden Energy, SFXS Marketing, Eos Investment Group, Eos LNG Group,
and Eagle Point

151.    By reason of the foregoing, Plaintiffs are entitled to and hereby request that the

court enter a declaratory judgment by which their rights and interests in the Venture

generally and in, more particularly, Eos INVEST and Eos LNG Group are determined

and adjudicated.

152.    Likewise, by reason of the foregoing Plaintiffs are entitled to and therefore

request that the Court adjudicate and determine their rights in any other asset or property

held by any of the defendants in assets or property acquired in the course of or otherwise

property properly a part of the Venture, including, but not limited, any equity interest in

GNL Talcahuano SpA.

## COUNT VI
## FRAUDULENT TRANSFERS
Kunian, Bainbridge, Lois Kunian, Strong and Gadson
v.
Smollon, Williams, Khambata, Tilden Energy, SFXS Marketing, and Eagle Point

153.    Smollon and Williams assigned or transferred equity interests in the Venture to

the Defendants Khambata, Tilden Energy, SFXS Marketing and Eagle Point in order to

29

place those assets beyond the reach of creditors and, in particular, to conceal them from the Plaintiffs and prevent the plaintiffs reaching those interests.

**COUNT VII**
**ACTION TO REACH AN APPLY**
Kunian, Bainbridge, Lois Kunian, Strong and Gadson
v.
Khambata, Tilden Energy, SFXS Marketing, and Eagle Point

154.    Defendants Khambata, Tilden Energy, SFXS Marketing and Eagle Point Energy Holdings hold equity interests in Eos INVEST and probably in Eos LNG Group to which the Plaintiffs are rightfully entitled for the reasons set forth in this Verified Complaint.

155.    By reason of the foregoing, Plaintiffs are entitled to reach the equity interests in Eos INVEST and Eos LNG Group, if any, that are held by the Defendants and apply such to the debts and obligations and damages which the Plaintiffs are entitled to recover from Smollon and Williams.

# DEMANDS FOR RELIEF

WHEREFORE, Plaintiffs demand the following relief:

A. After a hearing, enter a preliminary injunction that:

    (1) enjoins the each of the Defendants or their agents from transferring, dissipating, or disposing of equity or assets in the Venture, including but not limited to any equity interest owned directly or indirectly or standing in their names of Eos Investment Group LLC,  Eos LNG group LLC or GNL Talcahuano SpA absent the further order and approval by this Court upon satisfactory demonstration that such a transfer is in the best interests of each Plaintiff;

    (2) enjoins the Defendants from using funds or other assets belonging to, entrusted to or invested in either Eos LNG Group LLC, Eos Investment Group LLC or GNL Talcahuano SpA to finance or pay their legal fees and expenses of defending this action;

    (3) enjoins the Defendants Smollon and Williams from engaging in any activity or operation that competes with the Chilean LNG Export-Import Venture;

    (4) requires that Defendants Smollon, Williams, Eos Investment Group LLC and Eos LNG Group LLC to file detailed Income Statements and Balance Sheets with the Court within fifteen days of the close of each fiscal quarter along with a status report of no less than two 8.5" x 11" pages listing the major operational activities of those entities during the previous quarter; and

(5) enjoins all Defendants from making further use of the name "EosLNG" or use of the domain name eoslng.com in their communications or representation to third parties.

B. After trial, determine and enter a declaratory judgment which sets forth the respective rights of each Plaintiff in the Venture generally, in Eos INVEST and Eos LNG Group, GNL Talcahuano SpA and any other entity, asset or interest forming a part of the Venture to which the Plaintiffs have a valid claim and enter such injunctive and other equitable relief as the Court determines is necessary to restore each Plaintiff to the respective percentage of equity rights and interest that each such Plaintiff enjoyed in the Venture at the time of the freeze-out.

C. Impose a constructive trust on the equity interests held by any Defendant in Eos Investment Group LLC, Eos LNG Group LLC or any stock held by any Defendant in GNL Talcahuano SpA for the benefit of the Plaintiffs in such amounts as the court determines is just and equitable.

D. Enter an award of damages plus prejudgment interest in accordance with Mass. G.L. c.231, § 6H jointly and severally against each Defendant in such amount and in accordance with such terms and conditions as the Court and Jury so determine to award to include but not be limited to amounts the plaintiffs incurred in legal fees and expenses in preparing and prosecuting this action.

E. Enter an order allowing Plaintiffs to reach and apply the assets of and equity interests held by any Defendant in Eos Investment Group LLC, Eos LNG Group LLC and/or GNL Talcahuano Spa to satisfy and ensure compliance with any judgment issues by the Court.

F. Enter such additional equitable relief as the Court determines to be just and reasonable.

G. Enter such additional and further relief as the Court may determine to be just and reasonable.

# JURY DEMAND

Plaintiffs demand trial by jury on all counts so triable.

ANDREW J.C. KUNIAN,
LOIS R. KUNIAN,
KEITH BAINBRIDGE,
KENT A.  STRONG, and
EZA A. GADSON,
Plaintiffs,

By their attorneys,

Bruce W. Edmands (BBO# 151360)
(BWEDMANDS@EDMANDS-WILLIAMS.COM)
EDMANDS & WILLIAMS LLC
29 Crafts Street
Suite 360
Newton, MA 02458
Tel: 617-558-1500

Joshua M.D. Segal (BBO# 678367)
jsegal@lawson-weitzen.com
LAWSON & WEITZEN LLP
88 Black Falcon Ave, Ste. 345
Boston, MA 02210
(617) 439-4990
(617) 439-3987 (fax)

I HEREBY ATTEST AND CERTIFY ON
Oct. 29, 2018
, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY:

Asst. Clerk

Date:  10/4/18

34

# VERIFICATION

I, Andrew J.C. Kunian, a Plaintiff in the above captioned action, state under penalty of perjury, that the allegations set forth in this complaint are based on my personal knowledge and investigation and are true and accurate to the best of my knowledge, with the exception of those allegations expressly based on information and belief, in which case, I belief such averments to be true.

Andrew J.C. Kunian

# EXHIBIT

# A

OPERATING AGREEMENT OF

Eos Infraestructure LLC

THE SECURITIES REPRESENTED BY AND ISSUED PURSUANT TO THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE SECURITIES LAWS OF ANY STATE. THESE SECURITIES MAY NOT BE TRANSFERRED OR ASSIGNED WITHOUT THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION UNDER SUCH LAW AND WITHOUT COMPLIANCE WITH THE PROVISIONS OF THIS OPERATING AGREEMENT DATED MAY 15TH, 2015 AS SUCH AGREEMENT MAY BE AMENDED AND IN FORCE AT THE TIME. A COPY OF SUCH AGREEMENT IS AVAILABLE AT THE PRINCIPAL OFFICE OF THE COMPANY.

Eos Infraestructure LLC

OPERATING AGREEMENT

ARTICLE 1 -- GENERAL

Section 1.1.  Overview.

    This Operating Agreement (this "Agreement") is made as of May,15th, 2015 and sets forth the manner in which the Company will be operated and the manner in which the profits and losses of the Company will be shared by the Members. This Agreement is intended to be the Company's "operating agreement" pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. S 18-101, et seq (the Act).

Section 1.2.  Name.

    The name of the Company shall be Eos Infraestructure, LLC. (the "Company")

Section 1.3.  Principal Office; Registered Office.

    The registered office in the State of Delaware is located at 16192 Coastal Highway, Lewes, Sussex County, Delaware 19958-9776. And the name of the registered agent of the Company at such address for the service of process in the State of Delaware is Harvard Business Services, Inc.

    The principal office of the Company shall be at 308 Marlborough St, Boston, Ma. 02116 or such other place or places as the Managers from time to time determine.

Section 1.4.  Fiscal Year.

    The fiscal year of the Company shall end on December 31st, or such other day as the Managers from time to time determine.

Section 1.5.  Duration.

    The Company shall continue in existence until terminated in accordance with the provisions of this Agreement or the Act.

Section 1.6.  Purposes.

    The purposes of the Company are (i) to own and operate a business engaged in the process of manufacturing, processing, extracting, exporting, importing, regasifying, selling and distributing Liquefied Natural Gas and natural gas ; (ii) to engage in any lawful activity under the Act; and (iii) to make, enter into and perform any contracts and other undertakings and to engage in any activities and transactions as may be ancillary to, or necessary or advisable for carrying out, the foregoing

1

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the date first above written.


_____
**Colin B Williams**


_____
Andrew J. Kunian


_____
**Frank Smollon**

EXHIBIT A – Initial Capital Contributions

| Members | Initial Capital Contributions | Units | Participating Percentages |
|---|---|---|---|
| Andrew J. Kunian | $100 | 2050 | 20.50% |
| Colin B. Williams | $100 | 2050 | 20.50% |
| Frank Smollon | $100 | 2050 | 20.50% |
| Treasury | $100 | 3850 | 38.50% |

# EXHIBIT
# B

LIMITED LIABILITY COMPANY

OPERATING AGREEMENT

OF

EOS INVESTMENT GROUP LLC

EFFECTIVE AS OF

FEBRUARY 18, 2016

# TABLE OF CONTENTS

Page

ARTICLE 1 GENERAL TERMS...........................................................................................1

    1.1    Limited Liability Company......................................................................1
    1.2    Filing of Certificate ................................................................................1
    1.3    Name ........................................................................................................1
    1.4    Registered Agent and Office....................................................................1
    1.5    Term ........................................................................................................2
    1.6    Filings .....................................................................................................2
    1.7    Definitions and Interpretation. ................................................................2

ARTICLE 2 MEMBERS AND UNITS............................................................................10

    2.1    Units ......................................................................................................10
    2.2    Unit Certificates. ...................................................................................11
    2.3    Register of Members .............................................................................12
    2.4    Meetings of Members; Member Voting Rights. ....................................12
    2.5    Certain Duties and Limitation of Liability.............................................13
    2.6    Additional Issuances of Units ...............................................................14
    2.7    Preemptive Rights .................................................................................14
    2.8    Terms and Conditions of Issuances of New Units .................................16
    2.9    Representations and Warranties .............................................................17

ARTICLE 3 BUSINESS OF THE COMPANY ...............................................................18

    3.1    General ..................................................................................................18

ARTICLE 4 CAPITAL CONTRIBUTIONS AND LOANS.............................................19

    4.1    Capital Accounts...................................................................................19
    4.2    Capital Contributions............................................................................19
    4.3    Return of Contributions ........................................................................20

ARTICLE 5 DISTRIBUTIONS .......................................................................................20

    5.1    General ..................................................................................................20
    5.2    Distributions..........................................................................................20
    5.3    Predecessors in Interest.........................................................................20
    5.4    Withholding ...........................................................................................21
    5.5    Distributions in Kind.............................................................................21
    5.6    Limitations on Distributions .................................................................21
    5.7    Tax Distributions. .................................................................................21

ARTICLE 6 PROFITS AND LOSS ALLOCATIONS ....................................................22

    6.1    Allocations ............................................................................................22
    6.2    Special Rules.........................................................................................22
    6.3    Tax Allocations.....................................................................................25

ARTICLE 7 MANAGEMENT ........................................................................................25

    7.1    Management by Manager.  ....................................................................25

# TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| 7.2 | Certain Actions Requiring Super Majority Approval of the Members | | 26 |
| 7.3 | Officers;. | | 27 |
| 7.4 | Limitation of Manager Liability. | | 28 |
| 7.5 | Corporate Opportunities | | 29 |
| 7.6 | Non-Compete. | | 29 |

ARTICLE 8 BOOKS AND RECORDS; FINANCIAL MATTERS ..................................... 30

| | | | |
|---|---|---|---|
| 8.1 | Accounting and Fiscal Year | | 30 |
| 8.2 | Books and Records | | 30 |
| 8.3 | Company Budgets | | 30 |
| 8.4 | Financial Statements. | | 31 |
| 8.5 | Periodic Reports. | | 31 |
| 8.6 | Confidentiality | | 31 |
| 8.7 | Tax Matters. | | 32 |

ARTICLE 9 TRANSFERS ................................................................................. 33

| | | | |
|---|---|---|---|
| 9.1 | Void Transfers | | 33 |
| 9.2 | Transfers of Units. | | 34 |
| 9.3 | Additional Transfer Terms and Conditions | | 37 |
| 9.4 | Involuntary Transfers | | 38 |
| 9.5 | Resignation of Members | | 38 |
| 9.6 | Admission of Members | | 38 |

ARTICLE 10 DISSOLUTION AND TERMINATION ................................................ 38

| | | | |
|---|---|---|---|
| 10.1 | Events of Dissolution | | 38 |
| 10.2 | Procedures Upon Dissolution. | | 39 |
| 10.3 | Termination of Company | | 40 |
| 10.4 | Continuation of Company | | 40 |

ARTICLE 11 MISCELLANEOUS PROVISIONS ..................................................... 40

| | | | |
|---|---|---|---|
| 11.1 | Cumulative Remedies; Amendment | | 40 |
| 11.2 | Disclaimer of Agency | | 40 |
| 11.3 | Notices and Information | | 40 |
| 11.4 | Consequential Damages. | | 41 |
| 11.5 | Counterparts | | 41 |
| 11.6 | No Right to Partition | | 41 |
| 11.7 | Additional Documents; Further Assurances | | 41 |
| 11.8 | Governing Law; Waiver of Jury Trial | | 41 |
| 11.9 | Submission to Jurisdiction; Waiver of Venue | | 42 |
| 11.10 | Binding Effect | | 42 |
| 11.11 | Partial Invalidity | | 42 |
| 11.12 | Captions | | 42 |
| 11.13 | No Rights in Third Parties | | 42 |
| 11.14 | No Title to Company Property | | 42 |
| 11.15 | Persons Not Named. | | 43 |

**TABLE OF CONTENTS**
(continued)

Page

11.16   Entire Agreement ................................................................................................ 43

SCHEDULE 1          Register of Members
SCHEDULE 7.3        Officers of the Company

# LIMITED LIABILITY COMPANY
# OPERATING AGREEMENT

## OF

## EOS INVESTMENT GROUP LLC

This Limited Liability Company Operating Agreement as amended and/or restated from time to time (this "*Agreement*") of EOS Investment Group LLC, a Delaware limited liability company (the "*Company*"), effective as of February 18, 2016 (the "*Effective Date*"), is executed and entered into by and among the Company and the other parties listed on the signature pages hereto as "Members" and any other Person who subsequently becomes a party to this Agreement and is admitted as a Member (collectively, the "*Members*"). Capitalized terms used herein are used with the meanings set forth in Section 1.7.

## RECITALS

A.    The Company was formed as a Delaware limited liability company pursuant to and in accordance with the LLC Act upon the filing of the Certificate with the office of the Secretary of State of the State of Delaware, as more fully set forth below.

B.    Each of the Members agrees to adopt this Agreement with respect to various matters relating to the Company, and the Members hereby amend and restate as follows.

**NOW, THEREFORE,** in consideration of the premises and the mutual undertakings contained herein, the parties hereto hereby agree as follows:

## ARTICLE 1

## GENERAL TERMS

**1.1    Limited Liability Company.**  The Company is hereby organized as a limited liability company under the LLC Act for the purposes, and subject to the other provisions, set forth herein. It is intended that the Company be classified, for U.S. federal income tax purposes, as a partnership and not as an association taxable as a corporation.

**1.2    Filing of Certificate.**  A certificate of formation (the "*Certificate*") for the Company was executed and filed with the office of the Secretary of State of the State of Delaware by an authorized person in accordance with the LLC Act on February 18, 2016 (such filing being hereby ratified and confirmed in all respects).

**1.3    Name.**  The name of the Company is "EOS Investment Group LLC".

**1.4    Registered Agent and Office.**  The Company shall maintain within the State of Delaware a registered agent for service of process on the Company and a registered office in accordance with the provisions of the LLC Act.

**8.4**   **Financial Statements.**

(a)   **Quarterly.**   Within thirty (30) days after the close of the first, second and third quarters of each Fiscal Year, the Company shall cause to be furnished to each Member quarterly (and year-to-date) unaudited financial statements for the Company prepared in accordance with GAAP (but without footnotes and subject to year-end audit adjustments), certified by an appropriate Officer acting on behalf of the Company, including (i) a balance sheet showing the Company's financial position as of the end of such calendar quarter, (ii) supporting profit and loss statements, (iii) a statement of cash flows and (iv) a statement of changes in equity.

(b)   **Annual.**   Within ninety (90) days after the end of each Fiscal Year, the Company shall cause to be furnished to each Member financial statements with respect to such Fiscal Year of the Company, consisting of (i) a balance sheet showing the Company's financial position as of the end of such Fiscal Year, (ii) supporting profit and loss statements, (iii) a statement of cash flows for such year and (iv) a statement of changes in equity (together, the "*Financial Statements*").   Unless otherwise determined by the Manager, the Financial Statements shall be prepared in accordance with GAAP and shall be audited by a nationally-recognized accounting firm.

**8.5**   **Periodic Reports.**   The Manager shall cause, at the Company's expense, to be delivered to each Member, the following reports, information and financial statements at the times indicated below:

(i)   Annually, and not later than sixty (60) days after adopted by the Manager, the Operating Budget for the upcoming Fiscal Year.

**8.6**   **Confidentiality.**   Each Member shall hold all non-public information regarding the Company and its Subsidiaries, and their respective businesses, confidential, it being understood and agreed that, in any event, a Member may make:

(a)   disclosures of such information to Affiliates and members of such Member and to their advisors as well as any nationally recognized statistical rating organization so long as such Affiliates, members, agents and advisors agree to keep such information confidential in accordance with the requirements of this Section 8.6;

(b)   with prior written approval of the Manager, disclosures of such information reasonably required by any bona fide or potential permitted assignee or transferee of, or financing party to, direct or indirect ownership of a Unit in connection with the contemplated Transfer by, or financing of, such Member of any of such Member's Units herein, so long as such assignees, transferees or financing parties, as applicable, agree to keep such information confidential in accordance with a customary confidentiality agreement;

(c)   disclosures required or requested by any Governmental Authority or representative thereof or pursuant to legal or judicial process; *provided, that,* unless specifically prohibited by applicable law or court order, each such Member shall make reasonable efforts to notify the Company of any request by any Governmental Authority or representative thereof (other than any such request in connection with any examination of the financial condition or

other routine examination of such Member by such Governmental Authority) for disclosure of any such non-public information prior to disclosure of such information; and

(d)     disclosures of information that is generally known to the public at the time of disclosure or becomes generally known to the public other than as a result of a disclosure by the Member or its representatives.

This Section 8.6 shall survive the termination of the Company, this Agreement or a Member's withdrawal from the Company, as applicable, for a period of one (1) year from the applicable event.

**8.7     Tax Matters.**

(a)     **Status of the Company.**  The Company and each Member acknowledge that, as of the Effective Time, the Company is a partnership for U.S. federal and state income and franchise tax purposes and hereby agree not to make any election, or take any other action, that would cause the Company to be treated as other than a partnership for federal, state or local tax purposes, including any action that would result in the Company being treated as a "publicly traded partnership" within the meaning of Section 7704 of the Code and the Treasury Regulations.  Each Member further agrees not to elect for the Company to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar state statute and to file all tax returns accordingly.   Neither this Agreement nor the treatment of the Company as a partnership under the Code shall be deemed to create a partnership among the Members for any other purpose whatsoever.

(b)     **Tax Elections and Reporting.**

(i)     **Generally.**     Except as otherwise expressly stated in this Agreement, the Manager shall cause the Company to make all such elections under the Code or Treasury Regulations as the Manager may choose in its reasonable discretion.

(ii)     **Tax Information.**   No later than one hundred and twenty (120) days after the end of each Fiscal Year, each Person who was a Member at any time during the Fiscal Year shall be provided with an information letter (containing such Member's Form K-1 or comparable information) with respect to its distributive share of income, gains, deductions, losses and credits for income tax reporting purposes for such Fiscal Year, together with any other information concerning the Company necessary for the preparation of a Member's U.S. federal income tax return(s).

(iii)     **Company Tax Returns.**   A firm of certified public accountants selected by the Manager shall, if the Manager so determines, be retained to prepare or review the necessary federal income tax returns and information returns for the Company.  Any such tax returns not prepared or reviewed by the firm of certified public accountants, and all other tax returns, shall be prepared in a manner directed by the Manager. Each Member shall provide such information, if any, as may be needed by the Company for purposes of preparing such tax and information returns so long as such information is readily available from regularly maintained accounting records.

-32-

IN WITNESS WHEREOF, the Company and the Members have executed and delivered this Amended and Restated Limited Liability Company Operating Agreement as of the Effective Time.

COMPANY:

EOS INVESTMENT GROUP LLC

By: _____
Name: Colin B. Williams
Title: President

MEMBERS:

_____
Tilden Energy, LLC
By its Sole Member: Colin B. Williams

_____
SFXS Marketing Group, LLC
By its Sole Member; Sean FX Smollon

_____
Zubin Khambata

_____
Eagle Point Energy Holdings, LLC
By its Manager: Brian Donohue

## SCHEDULE 1

## REGISTER OF MEMBERS

March 17, 2016

| MEMBER | ADDRESS, AND JURISDICTION OF ORGANIZATION | PERCENTAGE INTEREST | UNITS |
|---|---|---|---|
| Tilden Energy, LLC | 8703 Shadow Lane Glen Allen, VA Virginia | 25% | 250 |
| SFXS Marketing Group LLC | 1 Craven Lane Suite 6276 Lawrence, NJ 08648 | 25% | 250 |
| Zubin Khambata | 26 Crown Terrace Yardley, PA 19067 | 25% | 250 |
| Eagle Point Energy Holdings, LLC | 6 Humbert Lane Princeton, NJ 08452 | 25% | 250 |
| TOTALS: | | 100.00% | 1,000 |

## SCHEDULE 7.3

### OFFICERS OF THE COMPANY

| Title | Name |
|---|---|
| President | Colin B. Williams |
| Vice President | Francis X. Smollon |

# EXHIBIT
# C

**Post 2016 Smollon/Williams Companies Counterparty Contract Structure**

- **CRI Investments SpA** — Chilean Partner — 48% Equity Import Terminal
- **Eos Investment Group LLC** — USA Partner — 52% Equity Import Terminal
- Binding Development Agreement
- **GNL Talcahuano** Terminal Marítimo — Import Terminal
- Terminal Use Agreement
- **Gas Natural Del BioBío** — LNG Buyer
- LNG Sale & Purchase Agreement
- **Eos LNG Group** — LNG Seller
- Terminal Use Agreement

**Pre 2016 Kunian Companies Counterparty Contract Structure**

- **Eos Infraestructure** — USA Partner — 51% Equity Import Terminal
- **COMPAÑIA REGIONAL DE INFRAESTRUCTURAS S.A.** — ChileanPartner — 49% Equity Import Terminal
- Memorandum of Agreement
- **GNL del BioBío** terminal marítimo — Import Terminal
- Terminal Use Agreement
- **Eos LNG** — LNG Seller
- LNG Sale & Purchase Agreement
- **Gas Natural Del BioBío** — LNG Buyer
- Terminal Use Agreement

# EXHIBIT
# D

Subject: **Important Update**
From: **"Frank Smollon" <fxs@eosIng.com>**
Date: **Fri, Aug 24, 2018 2:02 pm**
To: **"'Zubin Khambata'" <zubink78@gmail.com>**
Cc: **'Juan_Fco._Sánchez' <pacificbrokers@gmail.com>, "Colin Williams" <cbw@tildenenergy.com>**

Hello Zubin,

It has been a fairly tumultuous day, considering the nature of the email sent by that asshole last night.

After some thought, in the face of what to me seem to be JF's complete inability to control this asshole, that I am going to take certain actions, unilaterally, or in concert with Colin and yourself to exit this business, and wind up all business matters in Chile.

My plan is that if there is not a new written agreement between Eos and CRI by next Friday, I am going to begin the process, and it will be quick, to sell ALL of the shares of SFXS and Eagle Point to one or more of the Five Families in Santiago.

I will then also carry out a 'FCPA Self Report,' against Juan Ignacio / GNLT, et al. As you know, my cousin, Mary Galligan, is the Agent-in-Charge of the FBI in the Southern District of New York. Over 80% of all FCPA cases go through this Office, which is powerhouse for the FBI after DC. Here is a link to the notice when was made head of the Southern District back in 2010; https://archives.fbi.gov/archives/news/pressrel/press-releases/mary-e.-galligan-named-new-york-division2019s-first-female-special-agent-in-charge

I am also going to immediately retain an attorney in Santiago and file a lawsuit against Juan Ignacio for fraud, theft, FCPA violations, misconduct and so on and so forth. I will additionally name the fucking Russian and the fucking Canadians as co-conspirators, and will also name them in the FCPA criminal complaint. I know the FCPA inside and out and before I even have the books on this asshole in front of me, I know I will be able to tie in the Russian and the Canadians to the FCPA criminal complaint.

I am then going to hire a media company in Chile to make sure that this asshole's troubles get really abundant coverage in the press in Chile, and I will also carry on the same press campaign in the international realm.

Finally, I am going to sell the license4s for Octcet and the Waster-to-Energy technology to the people in the Five Families as part of a package deal with the shares of SFXS and Eagle Point.

That is about it for now. We can catch up with a call tomorrow.

Thanks,

FX